IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DAVID AND DONNA SCHELL, HOWARD
PICKENS, AND RON OLIVER, INDIVIDUALLY,
AND AS REPRESENTATIVE PARTIES ON
BEHALF OF SURFACE OWNERS,

        Plaintiffs,

        vs.                Case No. 07-1258-JTM

OXY USA, INC.,

        Defendant.

MEMORANDUM AND ORDER

The following matters are before the court: Plaintiffs' Motion for Summary Judgment (Dkt. No. 86); Defendant's Cross-Motion for Summary Judgment (Dkt. No. 90); and Plaintiffs' Motion for Permanent Injunction (Dkt. No. 100). After extensive briefing by both parties, the court is prepared to rule. For the following reasons, the court grants plaintiffs' summary judgment motion and denies defendant's motion. The court denies plaintiffs' Motion for Permanent Injunction.

**I. Findings of Fact**

OXY USA, Inc., (OXY) is an international oil and gas company that operates gas wells on plaintiffs' property pursuant to gas leases encumbering the property. Most of the gas leases contain a "free gas clause." Of the approximately 2,200 class members, around 1,900 do not currently use house gas. Prior to the filing of this lawsuit and during its pendency, OXY has provided the 300

plaintiffs that do use house gas, useable gas free of cost.[1] OXY makes a direct tap off the wellhead line itself to create a gas tap for every individual surface owner. OXY installs the tap at its cost, but how the surface owner connects to the tap is not its prerogative. The surface owners use house gas for heat, hot water, cooking, drying laundry, and other things. Presently, OXY has not interrupted, interfered with, or disconnected the named class representatives' homes from the use of free gas. OXY has, however, installed compressors that lower wellhead pressures, which in turn lowers the house gas delivery pressure. Two of the named plaintiffs, Donna and David Shell, have testified that the cost of converting to an alternative energy source in a rural area is expensive. David has testified that he uses electricity to power a stove, the lights, and the air conditioning at their home.

### A. The Leases

The named plaintiffs either use free gas or own property with a free gas connection. Approximately 2,000 leases contain a free gas clause. Of that number, approximately 300 currently use house gas from the wells. Most of the leases (over 90%) define plaintiffs' entitlement to "house gas" in one of the following ways:

> (1) [L]essor to have gas free of charge from any gas well on the leased premises for stoves and inside lights in the principal dwelling house on said land by making his own connections with the well, the use of such gas to be at the lessor's sole risk and expense.
>
> Lessor shall have the privilege at his own risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling located on the leased premises by making his own connections thereto.
>
> (2) [L]essor to have gas free of cost from any such well for all stoves and all inside

_____

[1]At least one person, Donnie Young, purchased a house from Jim and Marilyn Randall who had voluntarily switched to propane. Mr. Young then requested OXY set up a new house gas tap for his home. OXY refused citing high H2S levels.

> lights in the principal dwelling house on said land during the same time by making his own connections with the wells at his own risk and expense.

Dkt. No. 92, Exs. A-C. The remaining leases provided:

> The lessor to have gas free of cost from any well on the leased premises where gas only is found for all stoves and inside lights in the principal dwelling house on said premises by making his own connection to said well; such connection, the necessary fittings and pipe shall be furnished and maintained by lessor free from leaks and all without cost, expense or risk to lessee. The use of said gas by lessor at all times shall be at his sole risk.

Dkt. No. 92, Ex. D.

In August 2007, OXY sent letters to free house gas users in Kansas advising them their gas contained high concentrations of hydrogen sulfate (H2S), which is extremely dangerous and potentially hazardous to humans. OXY "strongly encourage[d] [plaintiffs] to convert [their] residence[s] to an alternative energy source as soon as possible."[2] Dkt. No. 87, Ex. G (alterations added). OXY sent separate letters to users of free house gas advising them of declining pressure, which threatened to interrupt gas supply. In this letter, OXY also "strongly encourage[d] [plaintiffs]

---

[2]The letter warning of high concentrations of H2S provided:
Ladies and Gentlemen,

OXY USA Inc.'s records indicate that pursuant to the provisions of an oil and gas lease you are currently taking natural gas directly from a well operated by OXY to be used in your residence for limited purposes. This is sometimes referred to as house-gas, a gas tap or a house-gas tap, and is required to be installed and maintained by you at your sole risk and cost. As OXY has previously advised you, use of this gas can be dangerous practice if equipment is not properly constructed, operated and/or maintained. In order that you can better understand some of the associated risks with using this gas, please see the enclosed HEALTH FACTS information relating to hydrogen sulfide (H2S).

The well from which you receive your house gas has particularly high levels of H2S. Therefore, OXY strongly encourages you to convert your residence to an alternative energy source as soon as possible. OXY has implemented a program to financially assist its legitimate house-gas users with the costs of permanently converting to another energy source, such as propane, electricity or natural gas from a local utility[.]
Dkt. No. 87, Ex. G.

3

to convert [their] residence[s] to an alternative energy source as soon as possible."[3] Dkt. No. 87, Ex. H (alterations added). Although different, the letters conveyed to plaintiffs that their free gas could be in jeopardy.

### B. Low Pressure and High H2S

Natural gas may have many characteristics as it is extracted from an underground formation. It may have high H2S content or contain other contaminants such as water vapor or liquid water. Natural gas also varies in terms of its hydrocarbon composition and heating value. Gas has high heating value when it contains significant levels of heavier hydrocarbons. These heavy hydrocarbons may be removed from the production stream leaving gas with a lower Btu content than is suitable for home heating. Gas with high heating value must be processed because home furnaces are not designed to burn gas with a Btu content higher than 1,050 to 1,000 Btus per cubic foot. Processing gas requires the construction of plants that are economic only when large volumes of gas from multiple wells are processed at the same location. Often these plants are miles away from individual wells.

All wells have a finite productive life. Wells near the end of that life often experience

---

[3]The low pressure form letter stated, in pertinent part:

OXY USA Inc. wishes to make you aware of a situation that may adversely affect your ability to receive gas in the future. The pressure in the well to which you have connected at your sole risk and cost that supplies gas to your residence is declining to a level that makes your ability to continue to receive future house-gas tap deliveries uncertain. **Therefore, [] OXY cannot assure that you that you will be able to continue to receive house-gas from this well, beginning perhaps as soon as the winter of 2007-2008.** Once the well reaches this point in pressure decline, you will need to find an alternative energy source. OXY is advising you of this at this time in order for you to have sufficient time to consider alternative energy sources, and make the necessary arrangement to implement any changes that you may elect to accommodate your future energy needs.

OXY strongly encourages you to convert your residence to an alterative energy source as soon as possible.

Dkt. No. 87, Ex. H.

pressure declines and H2S increases.[4] In an effort to extend the life of the wells, OXY uses downstream compression to produce greater volumes for sale than would be otherwise available. Defendant's and third parties' gathering system compressors lower wellhead pressure and lead to higher H2S concentrations.

OXY takes H2S readings of all its wells at least annually for safety reasons. Most of OXY's contracts require the H2S levels be at least 4 parts per million (ppm) and no more than 10 ppm. Anything above 10 ppm is potentially dangerous requiring OXY to post warning signs to protect its employees, independent contractors, and the public, including surface owners. OXY understands that "people may not recognize the issues related to H2S and what it can do to you health wise." Dkt. No. 87, Ex. A, at 62. As a result, OXY takes H2S issues seriously by monitoring H2S levels and training people on the hazards of that gas. OXY treats the H2S problem in a variety of ways. Most of the concerns are eliminated by blending gas with high H2S content with gas having lower H2S levels. This blending occurs downstream of any individual well. It is not practicable to move the house tap to a location downstream where the blending occurs. In other instances, OXY removes elevated H2S gas by using treating towers. Such towers are typically placed at a central location downstream of the wells so that large volumes of gas can be combined and treated in an economical way. However, house gas would still retain higher levels of H2S. If OXY were required to place treating towers at each individual well, production would likely be uneconomic and may shut down.

As for the low pressure problem, the parties agree the pressures in the Hugoton gas field are declining and that further production reduces pressure. In turn, low pressure increases the risk of H2S problems and the likelihood that the house gas lines will freeze off. A low pressure well is

---

[4]Although H2S is often found in depleted gas fields, elevated H2S can exist in new wells in native form among hydrocarbons.

cured either by using compression at the wellhead or on the gathering line. OXY has installed downstream compressors on the gathering line in an effort to keep the gas flowing. A compressor reduces pressure upstream (from the compressor) and increases pressure downstream (from the compressor) regardless of where the compressor is placed between the wellhead and the transmission line. OXY uses mostly gathering line compressors but also has 17 wellhead compressors. Compressors allow OXY to maximize production from the wells by reducing wellhead gathering line pressures and by transporting larger volumes of gas from the wells to buyers or processing facilities.

Wellhead compressors are expensive to buy, install, maintain, and operate. Purchase and installation costs are at or above $50,000. Once installed, OXY's trained mechanics perform the maintenance work. There are no commercially available natural gas compressors that are properly sized to compress the small volume of gas from a particular well to a user's home. Any compressor used in this way would overheat and fail within a short period of time because of insufficient volumes. Smaller air compressors could be modified to compress natural gas, but air compressors usually compress gas to 100 pound-force per square inch (psi) and the typical pressure for natural gas inside a home is less than 1 psi. Even if compression between the well and the home of an individual was feasible, formation of liquids or hydrates would occur after compression and cooling. Condensation of liquids and hydrates can extinguish flames that burn natural gas inside a home leaving unused and pressurized natural gas flowing inside.

*C. Procedural History*

Plaintiffs, David and Donna Shell, Howard Pickens,[5] and Ron Oliver, filed this action on August 31, 2007, on behalf of others similarly situated seeking a permanent injunction, declaratory judgment, and actual damages based on oil and gas leases entered into with OXY. On November 14, 2008, plaintiffs moved to certify the class under Rule 23. This court certified the following class as a Rule 23(b)(3) class action on July 29, 2009:

> [a]ll surface owners of Kansas land burdened by oil and gas leases held or operated by OXY USA, Inc., which contain a free gas clause.

Dkt. No. 54, pg. 12; *Shell v. OXY USA, Inc.*, No. 07-1258, 2009 WL 2355792, at *6 (D. Kan. July 29, 2009). Plaintiffs have subsequently amended their Complaint seeking injunctive and declaratory relief only. On November 23, 2010, plaintiffs filed the present Motion for Summary Judgment (Dkt. No. 86) requesting this court enter summary judgment "finding that OXY as the lessee has the duty to make usable the gas it provides to house gas users because: 1) the duty is express under the free gas clause in the leases; or 2) the duty is implied under Kansas law; or 3) both." Dkt. No. 87, pg. 17. Defendant responded and filed its Cross-Motion for Summary Judgment (Dkt. Nos. 90 & 93) arguing: (1) the express lease language requires the "use" of house gas occur at the plaintiffs' "sole risk and expense"; (2) OXY has a duty to permit the lease holders to use the gas produced at the well, not to assure its quality; and (3) that requiring OXY to modify its compression so the surface owners can use the gas at the well would adversely affect OXY's implied obligation to diligently produce the mineral estate for the mineral owners. In addition, defendant also argues the requested remedy of a declaratory judgment is not appropriate as it will not settle the controversy between the parties. Defendant argues that if this court recognizes a right to useable gas such a judgment will

---

[5]Howard Pickens died on September 28, 2009, and has since been removed as a named plaintiff in this case.

only lead to additional litigation because plaintiffs—who have no damages claim in this suit—will file another suit to enforce the right.

After the parties finished briefing their summary judgment motions, plaintiffs filed a Motion for Permanent Injunction (Dkt. No. 100). In this motion, plaintiffs seek a permanent injunction prohibiting OXY from, among other things, "interfering with, altering in any material respect, or eliminating the Plaintiff Class's supply of free house gas." Dkt. No. 101, pg. 1. Defendants have filed a Response opposing issuance of a permanent injunction on several grounds, which will be discussed later in the Memorandum. The court first addresses the parties' cross-motions for summary judgment.

## II. Legal Standard: Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact." *Id.* Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove [nonmovant's] claim; it need only establish

that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987) (alterations added).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 250-51. Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in *Matsushita*).

Finally, the court reminds the parties that summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). It is an important procedural vehicle "designed to secure the just, speedy and inexpensive determination of every action." *Id.* One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Id.*

**III. Conclusions of Law: Summary Judgment Motions**

9

Neither party disputes that OXY currently provides "free," useable gas to the 300 or so plaintiffs that currently use house gas. Further, OXY does not dispute that it must continue to provide plaintiffs free gas for the duration of the leases. The dispute in this case is whether, based on the language of the leases, OXY must bear the cost of making the gas useable to the surface owners at the well or whether plaintiffs must bear that cost. Said another way, plaintiffs believe the "free gas clause" in their leases entitles them to free *usable* gas. Defendants contend the plaintiffs are entitled only to free gas as it emerges from the well, whatever its condition.

### A. The Nature of Free Gas Clauses

Historically, free gas clauses have been included in many standard form oil and gas leases as partial consideration for the grant of rights from the lessor to the lessee. *See* Thomas P. Dugan, & James A. Gillespie, *In-Kind Gas Rights of Landowners—The Tap May Be "Free," but it Is not Free from Issues!*, 51 ROCKY MTN. MIN. L. INST. 14, § 14.02 (2005). Once created, the free gas covenant is generally held to be one that runs with the surface estate rather than a personal right. *See Schlup v. Bourdon*, 33 Kan. App.2d 564, 568, 105 P.3d 720, 724 (2005). The free gas clause has been described as "collateral, subordinate and incidental in character." *Bassell v. W. Va. Cent. Gas Co.*, 103 S.E. 116, 118 (W. Va. 1920). Thus, a lessor's right to free gas generally only accrues upon production of gas in paying quantities. *See Caylor v. Mendenhall*, 127 Kan. 290, 273 P. 172, 173 (1929).

Several issues have arisen regarding free gas clauses in oil and gas leases, however, this appears to be the first case to address whether such "free" gas must be in a useable condition. Often the dispute concerns the interpretation of "a principal dwelling" in the lease language, the source

of free gas, the quantity of free gas, or the geographic scope of the use of free gas. *See, e.g.*, *D.R. Lauck Oil Co. v. Breitenbach*, 20 Kan. App.2d 877, 879-80, 893 P.2d 286, 289 (1995) (holding provision in oil and gas lease authorizing lessor to use gas for agricultural purposes contained no geographical limitations); *Richardson v. Nw. Cent. Pipeline Corp.*, 241 Kan. 752, 759-62, 740 P.2d 1083, 1087-89 (1987) (holding a gas storage and oil lease providing for free gas "for domestic use at the principal dwelling house on said lands" and for low cost gas "for domestic use on said lands" in the event of storage limited the lessor to low cost gas at one principal dwelling); *Jackson v. Farmer*, 225 Kan. 732, 739, 594 P.2d 177, 183 (1979) (holding free gas clause under a unitized lease entitled lessors on adjoining quarter sections to take gas from the well, without charge, to heat their principal dwelling houses even though the well was located on another quarter section); *Casebolt v. Ky. W. Va. Gas Co.*, 168 S.W.2d 773, 777-78 (Ky. App. 1943) (holding plaintiffs were properly enjoined from using excessive amounts of gas not contemplated by the free gas clause in the lease).

Plaintiffs cite one case involving a lessor's right to free gas under a free gas clause when a lessee attempted to cease providing free gas. *See Bassell*, 103 S.E. 116. In *Bassell*, the main issue was whether the lessor was entitled to free gas under a free gas clause contained in the lease following the lessee's use of compressors and pumps, which cut off the supply of free house gas. *Id.* at 116. First, the court found that free gas was part of the consideration for, and a right granted by the lease. *Id.* at 117-18. The court also found such a right was subordinate to the commercial production also granted under the lease. *Id.* at 118. Nevertheless, the court held:

> But in no event, nor under any circumstances, can the lessee escape the obligation of its contract to furnish free gas for domestic use in the four dwelling houses upon the land, if required, while it operates any well under the lease. The lessor's right to such gas, although collateral, subordinate, and incidental in character, is clearly

conferred as that of the lessee to produce the gas from the land.

*Id.* Even if providing free gas to plaintiff "should entail considerable expense," the court held that lessee must provide free gas for the life of the lease. *Id.* The court also held the lessee could provide gas from other sources to meet its duty under the lease.

According to plaintiff, *Bassell* supports their position that OXY must provide free, useable gas under a free gas clause to a lessor even if the burden of doing so entails considerable expense.[6] Defendant contends *Bassell* does not support plaintiffs' position but rather confirms two other important principles: (1) that the interest of house gas users is subordinate to the development of the mineral estate; and (2) that no court should enjoin a lessee or require specific performance to ensure that a house gas user receives house gas.

First and foremost, *Bassell* does not address the specific question presented here—whether OXY must furnish free, useable gas to plaintiffs. *Bassell* held only that a lessee operating under a free gas clause may not avoid its obligations to provide free gas during the life of the lease, even if doing so entailed considerable expense. 103 S.E. at 118. The court never addressed the nature or quality of the gas the lessee must provide. In fact, OXY does not dispute, and is not trying to avoid, its obligation to provide plaintiffs with free gas for the life of the lease. Defendant contends only that it does not have to provide free *usable* gas under the leases. As such, *Bassell* provides only peripheral guidance on the issue presented here.

*B. General Principles of Kansas Contract Interpretation*

---

[6]The *Bassell* court also stated that the lessee could meets its obligation of providing free gas to the lessor from any other gas lines in the neighborhood whether the gas was from wells on the land at issue or not. *Bassell v. W. Va. Cent. Gas Co.*, 103 S.E. 116, 118 (W. Va. 1920). Plaintiffs argue this court could also order OXY to provide plaintiffs an alternative source of energy in a similar fashion.

"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction." *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231, 239 (2009). "Unambiguous contracts are enforced according to their plain, general, and common meaning in order to ensure the intentions of the parties are enforced." *Vanum Constr. Co. v. Magnum Block, L.L.C.*, 45 Kan. App.2d 54, 59, 245 P.3d 1069, 1073 (2010) (quoting *Johnson County Bank v. Ross*, 28 Kan. App.2d 8, 10, 13 P.3d 351, 353 (2000)). Reasonable contract interpretations are favored under the law. *Id.* "'[T]he law presumes that the parties understood their contract and that they had the intention which its terms import.'" *Iron Mound, L.L.C. v. Nueterra Healthcare Mgmt., L.L.C.*, 44 Kan. App.2d 104, 113, 234 P.3d 39, 45 (2010) (quoting *Tri–State Hotel Co., Inc. v. Sphinx Inv. Co., Inc.*, 212 Kan. 234, 246, 510 P.2d 1223, 1233 (1973)). More specifically, in the oil and gas context, the Kansas Supreme Court has stated:

> Among the familiar rules governing the construction of oil and gas leases are these: the intent of the parties is the primary question; meaning should be ascertained by examining the document from all four corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision; reasonable rather than unreasonable interpretations are favored; a practical and equitable construction must be given to ambiguous terms; and any ambiguities in a lease should be construed in favor of the lessor and against the lessee, since it is the lessee who usually provides the lease form or dictates the terms thereof.

*Jackson*, 225 Kan. at 739, 594 P.2d at 183.

Not surprisingly, both parties contend the express terms of the lease support their respective positions. First, plaintiffs argue the express terms of the leases require OXY to provide free house gas in a useable form. In support of this argument, plaintiffs point to language in many of the leases granting "gas free of charge" or "gas free of cost" to lessors. Plaintiffs simply argue free gas means

free, useable gas because unuseable gas is equivalent to no gas at all.

Defendant, on the other hand, contends the express language supports its position that it only need to provide free gas, regardless of its condition. "Free gas" requires defendant to produce gas for plaintiffs without cost, but does not specify its quality. According to defendant, free gas means simply free gas as it emerges from the well. Further, defendant points to language in the leases requiring "the use of such gas to be at the lessor's sole risk and expense," or some variation thereof. Defendant argues this "risk and expense" language expressly places the burden on plaintiffs to make the gas useable.

The first question this court must determine is whether the "free gas clauses" in the leases are ambiguous. "[L]anguage in a contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in the sense that the contract may be understood to reach two or more possible meanings." *Richardson*, 241 Kan. at 758, 740 P.2d at 1087. This court finds the leases here providing for "free gas" are ambiguous as to what quality of gas plaintiffs are entitled to receive. Depending on how the leases are interpreted, they could require the lessee to provide plaintiffs with free gas in a useable form. On the other hand, the leases could be interpreted to mean that defendant must provide plaintiffs free gas as it emerges from the well, regardless of its quality. The Kansas Supreme Court has "held that where ambiguity or uncertainty of contract is involved in an agreement, the intention of the parties is not ascertained by resort to literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be obtained, and other circumstances, if any, which tend to clarify the real intention of the parties." *Id*. Additionally, "any ambiguities in a lease should be construed in favor of the lessor and against the lessee, since it is the lessee who usually provides the lease form or

dictates the terms thereof." *Jackson*, 225 Kan. at 739, 594 P.2d at 183.

The leases at issue predominantly define plaintiffs' right to free gas in one of the following two ways:

> (1) [L]essor to have gas free of charge from any gas well on the leased premises for stoves and inside lights in the principal dwelling house on said land by making his own connections with the well, the use of such gas to be at the lessor's sole risk and expense.

> Lessor shall have the privilege at his own risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling located on the leased premises by making his own connections thereto.

> (2) [L]essor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the wells at his own risk and expense.

Dkt. No. 92, Exs. A-C. First, the meaning of the terms "free of charge" and "free of cost" cannot be viewed in isolation but must be read in conjunction with other language in the lease, specifically, the free gas clause at issue. *See Jackson*, 225 Kan. at 739, 594 P.2d at 183. In analyzing each of the above clauses, it is clear "free" gas necessarily entails "free usable gas." Immediately after the "free of charge" or "free of cost" language the clause provides the gas is to be used "for stoves and inside lights in the principal dwelling house." This restriction or specification on the use of the free gas illuminates much about the quality of gas required. By providing the gas is to be used for stoves and inside lights, the leases necessarily require the free gas provided be of such a nature that it is suitable for domestic use. A contrary reading would give little meaning to the phrase "for stoves and inside lights" as unuseable gas would not be suitable for those purposes. Several cases, in many different jurisdictions, confirm the purpose of free gas clauses is to provide gas to the lessor for domestic purposes. *See, e.g.*, *Deynzer v. Columbia Gas of Penn., Inc.*, 875 A.2d 298 (Pa. Super. Ct. 2005); *EOG Res., Inc. v. Wall*, 160 S.W.3d 130 (Tex. App. 2005); *Universal Res. Corp. v. Ledford*, 961

15

P.2d 593 (Colo. App. 1998); *Richardson*, 241 Kan. 752, 740 P.2d 1083; *Post v. Tenneco Oil Co.*, 648 S.W.2d 42 (Ark. 1983). Contract interpretations which give meaning to all terms in a contract are preferable to those that do not. *Dillard Dep't Stores, Inc. v. State, Dep't of Human Res.*, 28 Kan. App.2d 229, 235, 13 P.3d 358, 363 (2000) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)). Interpreting the lease to require OXY only to provide gas, whether it be useable or not, would frustrate the entire purpose of the free gas clause.

Defendant points to language in over 90% of the clauses at issue providing "the use of such gas to be at the lessor's sole risk and expense." According to defendant, such language expressly places the burden of converting the gas into a useable form on the plaintiffs.[7] This court believes defendant's interpretation goes well beyond what the express language provides and directly contradicts other terms in the clause. First, the free gas clause provides that lessors are entitled to free gas for domestic purposes. As noted above, this necessarily means free useable gas. Thereafter, the clause provides "the use of such gas be at lessors' sole risk and expense." This "sole risk and expense" language comes into play only after the lessee has fulfilled its obligation to provide lessors with free, useable gas for domestic purposes. Careful examination of the lease language confirms this. The words "the use of such gas" appear later in the clause, after the language stating the free gas is for domestic purposes. The most reasonable construction of the risk and expense language is that it applies to the gas intended and suitable for domestic purposes. Hence "such gas" means "useable gas." After the gas is in a useable form, the lessors bear the risk and expense of using that gas in their homes. Such risks and expenses presumably include the dangers of using natural gas

---

[7]The remainder of the leases require the lessor to make "his own connections with the wells at his own risk and expense." Dkt. No. 92, Ex. B. Defendant does not argue that this language expressly requires plaintiff to convert the gas into a useable form. Thus, defendant's express burden and risk argument applies to roughly 90% of the leases.

16

within a home for heat or to run appliances and the costs of purchasing equipment necessary to harness the natural gas for domestic purposes. *But cf. Weiss v. Thomas & Thomas Dev. Co.*, 680 N.E.2d 1239, 1242-43 (Ohio 1997) (holding the lessee, in providing free gas to the lessor, owed the lessor the same duty of care as a regulated public utility would owe its customers, despite express lease language placing the risk of using the gas on the lessor). Interpretation of the clause in this manner is consistent with and gives further meaning to the "for stoves and inside lighting" provision. *See Jackson*, 225 Kan. at 739-40, 984 P.2d at 183 ("The lease before [the court] must be read and considered as a whole . . . effect must be given, if possible, to all provisions of the lease.") (alterations added). Thus, the provision is more accurately interpreted to mean that plaintiffs bear the "sole risk and expense" of using the free gas, but only after defendant has provided plaintiffs free, useable gas.

Defendant also argues the language "from any gas on the well" and "by making his own connections with the well," further show the plaintiffs are entitled only to gas as it emerges from the well, regardless of its condition. In the context of the free gas clause, this court finds the "any gas on the well" and "with the well" language was meant to be a geographical restriction on the use of free gas rather than a description of the quality of gas required.[8] Defendant's citation to the Kansas Supreme Court's decision in *Sternberger v. Marathon Oil Co.*, does not change the result. 257 Kan. 315, 894 P.2d 788 (1995). That court held the language "market price at the well" meant the plaintiffs were responsible for their proportionate share of the reasonable expenses in transporting the gas from the wellhead to the market because there was no market for the gas at the wellhead. *Id.*

---

[8]The Kansas Supreme Court in *Jackson v. Farmer* did hold that a unitization clause allowed plaintiffs to take free gas from the unit well even if that well was not on their property. 225 Kan. 732, 739-40, 594 P.2d 177, 183-84 (1979).

at 331-32, 894 P.2d at 800. The court said nothing about the "at the well" language in relation to the quality of gas. Thus, defendant's reliance on *Sternberger* is unconvincing.

Next, defendant concludes other language in the leases referencing gas "free of cost" cuts against plaintiffs' "free, useable gas" argument. Specifically, defendant cites two clauses in one exemplar lease providing:

> The lessee shall deliver to lessor as royalty, free of cost, on the lease, or into the pipe line to which lessee may connect its wells the equal one-eighth part of all oil produced and saved from the leased premises
>
> The lessee shall have the right to use, free of cost, gas, oil and water found on said land for its operations thereon.

Dkt. No. 92, Ex. A. These clauses do not alter the interpretation of the free gas clause previously noted above. Neither clause contains specific descriptive language stating that the free gas was for stoves and inside lights, thus, they are not persuasive and do not affect the interpretation of the free gas clause.

### C. Conflicting Duties

The court has determined the express terms of the lease control the parties' obligations respecting this issue, therefore, it is unnecessary to consider plaintiffs' argument that the leases contain an implied covenant to make free house gas useable or whether the implied duty of good faith and fair dealing controls the parties' obligations. Nevertheless, defendant argues any duty placed upon it to make the free gas useable would conflict with its duty to produce and market the leases diligently as required under Kan. Stat. Ann. § 55-223. This statute provides:

> As a matter of Kansas public policy, all oil and gas leases and subleases for the exploration, development and production of oil, gas or other minerals, or any combination thereof, which are held by production shall be presumed to contain, in

18

> addition to any expressed covenants therein, an implied covenant to reasonably explore and to develop the minerals which are the subject of such lease. Such implied covenant shall be a burden upon the lessee and any successor in interest.

KAN. STAT. ANN. § 55-223 (2010). More specifically, the Kansas Supreme Court has held "[o]nce oil and gas is discovered in paying quantities, the lessee has an implied obligation to produce and market production diligently." *Robbins v. Chevron U.S.A., Inc.*, 246 Kan. 125, 131, 785 P.2d 1010, 1014 (1990).

First and foremost, defendant has an express duty under the leases to provide useable gas to plaintiffs. Regardless of defendant's implied duty to produce and market diligently, it cannot avoid its express duty to provide free, useable gas. The *Bassell* court recognized that even though the duty to provide free gas was subordinate to the duty to produce gas on the land, "in no event, nor under any circumstances, can the lessee escape the obligation of its contract to furnish free gas for domestic use." 103 S.E. at 118. The same conclusion applies here.

Defendant's argument that it cannot provide free useable gas and economically produce gas does not change the result. *See Pittsburg & W. Va. Gas Co. v. Nicholson*, 105 S.E. 784 (1921); *see also Bassell*, 103 S.E. at 118 ("It is therefore neither unreasonable nor inequitable to require [lessee] to restore that supply in some way, even though the restoration should entail considerable expense.") (alteration added). In *Nicholson*, the defendants entered into a lease with plaintiff providing for the production of gas. 105 S.E. at 784. The lease also provided that defendants were entitled to free gas from the lines. *Id.* Pressure in the wells began to decrease such that it would not flow through the plaintiff's line without installation of a compressor. *Id.* The installation of the compressor, however, created a vacuum in which gas only flowed through plaintiff's lines. *Id.* Plaintiff sought to avoid its obligation to provide free gas because it had become burdensome, if not impossible. *Id.* at 786. The

19

court held that the free gas covenant in the lease entitled defendants to free gas, even if the reality of providing free gas had become difficult or expensive. *Id.* at 787. In holding so, the court stated:

> For many years the plaintiff has been operating these wells, confessedly under very favorable conditions, and receiving large amounts of gas therefrom, and has no doubt realized large profits thereon, and can it be said that, because the time has come when it is necessary for it to expend some additional money in order to perform its contract, it must be relieved therefrom? In other words, that it be allowed to carry out and get all the benefits of its contract as long as conditions are highly favorable to it, but that as soon as conditions become burdensome in any way it must be relieved therefrom, and all of the burdens assumed by the other party?

*Id.* at 786-87. Similarly, plaintiffs here are entitled to free, useable gas under the leases. Defendant has been operating the well for many years under presumably favorable conditions; it cannot avoid that obligation simply because the act of providing free, useable gas recently has or soon will become difficult.

It is important to note that this court is not requiring defendant to place compressors on individual wells or to treat the gas to eliminate the high H2S problem in a manner defendant believes is economically unsound. Additionally, the court is not requiring defendant to cease using compressors on its lines. In fact, the court is not directing defendant to do anything other than to provide free, useable gas to plaintiffs as required under the leases. How it does so is not the court's concern at this stage. At least one court has, however, allowed a lessee to provide free gas from other sources as a way of meeting the free gas obligation. *See Bassell*, 103 S.E. at 118 ("Gas from any other wells or from any of the lessee's gas lines in the neighborhood will answer his purposes just as well as the gas from wells on his land, provided he obtains it in sufficient quantity and for the same period of time that such wells would furnish it.").[9]

---

[9]One commentator has also concluded:
Many operators/lessees are concluding that the management time and potential liability associated with "free gas" taps are better avoided, if possible. Consequently, many companies are attempting to

In sum, the express language of the leases, although ambiguous, is not silent on whether defendant must provide free, useable gas to plaintiffs. The language of the free gas clause, when analyzed as a whole, requires defendant to provide plaintiffs with free, useable gas pursuant to the free gas clauses contained in the leases. Such an interpretation gives effect to all the terms in the clause and provides a reasonable interpretation to the provision at issue. Further, defendant's implied duty to produce and market diligently, although important and likely superior to the plaintiffs' right to free gas, does not eliminate defendant's duty to provide free, useable gas. Last, this court also recognizes that its conclusion is furthered by interpreting the lease in the lessors' favor and to construe any ambiguities in favor of the lessor. *See Gilmore v. Superior Oil Co.*, 192 Kan. 388, 391, 388 P.2d 602, 605 (1964). Therefore, plaintiffs' Motion for Summary Judgment (Dkt. No. 86) is granted, and defendant's Cross-Motion for Summary Judgment (Dkt. No. 90) is denied.

## IV. Declaratory Judgment

The defendant believes this court should not grant the plaintiffs' requested declaratory judgment because such a declaration will not solve the controversy at issue. "The Supreme Court has long made clear that the Declaratory Judgment Act 'gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so.'" *State Farm Fire & Ca. Co. v. Mhoon*, 31 F.3d 979, 982 (10th Cir. 1994) (quoting *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112

---

substitute commercially delivered and serviced propane for natural gas coming directly from the wellhead. Some operators are offering to provide money or services to the tap holder to cover (1) the installation of propane-suitable or other alternative facilities in the dwelling and (2) the purchase of propane or other alternative energy supply over the period of time that the "free gas" tap would otherwise have been in effect. In some locales, operators are joining with propane suppliers to offer incentive programs to induce tap holders to agree to the transition.

Thomas P. Dugan & James A. Gillespie, *In-Kind Gas Rights of Landowners—The Tap may Be "Free," but It Is not Free from Issues!*, 51 ROCKY MNT. MIN. L. INST. 14, § 14.08 (2005) (footnote omitted).

(1962)); *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants."). The Declaratory Judgment Act, 28 U.S.C. § 2201 (DJA) provides that "[i]n a case of actual controversy within its jurisdiction," the court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (2006). Because the "case and actual controversy" language incorporates the Article III "case" or "controversy" requirement, the DJA is "procedural only," and "does not itself confer jurisdiction on a federal court where none otherwise exists." *MedImmune v. Genetech*, 549 U.S. 118, 126-27 (2007); *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937); *Henry v. Office of Thrift Supervision*, 43 F.3d 507, 512 (10th Cir. 1994).

The DJA imposes two hurdles for a party seeking a declaratory judgment. First, plaintiffs must assert "a case of actual controversy" within the jurisdiction of the presiding court. *Surefoot L.C. v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008); 28 U.S.C. § 2201(a). Second, whether to issue a declaratory judgement is entirely left to the discretion of the district court. *See MedImmune*, 549 U.S. at 136; *Mhoon*, 31 F.3d at 983. District courts may consider a number of factors, including whether a declaration: (1) would settle the controversy; (2) would serve a useful purpose in clarifying the legal dispute; (3) is being used merely for procedural fencing or to provide an arena for a race to res judicata; and (4) would increase friction between federal and state courts by improperly encroaching upon state court jurisdiction. *Mhoon*, 31 F.3d at 983. Courts also consider whether an alternative remedy is better or more effective. *Id.*

As to the first requirement, the defendant does not dispute that this case presents "a case of

actual controversy." It is the second element that is hotly contested. Primarily defendant argues a declaratory judgment will not settle the controversy and will lead to a spate of damages actions in the future. Plaintiffs argue (1) without a class-wide declaratory judgment individual class members would not be able to litigate their claims, (2) a damage claim, if needed, would be simple after a class-wide declaratory judgment has been entered, and (3) the plaintiffs have moved for injunctive relief, thus, there will not be a spate of damages actions.

First, a declaratory judgment in this action as to the parties' rights under the free gas clause would settle the controversy of whether defendant must provide plaintiffs with free, useable gas under the leases. Defendant is correct that declaratory judgment actions are often sought in situations in which an insurance company seeks a declaration of its liability. *See, e.g.*, *Horace Mann Ins. Co. v. Johnson*, 953 F.2d 575, 579 (10th Cir. 1991); *Farmers Alliance Mut. Ins. Co. v. Jones*, 570 F.2d 1384, 1386 (10th Cir. 1978). It is clear, however, that a district court has wide discretion to enter declaratory judgment in cases involving contract construction. *See Kunkle v. Cont'l Cas. Co.*, 866 F.2d 1269, 1276 (10th Cir. 1989) (stating "[i]ssues of contract construction arising out of a justiciable controversy . . . are themselves justiciable and may be considered by the federal courts"); *see also Keener Oil & Gas Co. v. Consolidated Gas Utilities Corp.*, 190 F.2d 985, 989 (10th Cir. 1951).

Defendant's argument about a spate of damages actions is misplaced because at the present time defendant has not discontinued plaintiffs' supply of free, useable gas, thus, plaintiffs have no damages. Moreover, plaintiffs' possible future action for damages is wholly dependant on a favorable decision on their present claim for declaratory judgment. If defendant subsequently stops providing free, useable gas the plaintiffs could bring a damages action based on this court's

declaratory judgment. The primary function of the DJA is to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §§ 2201 & 2202[10]; *see also Gant v. Grand Lodge of Tex.*, 12 F.3d 998, 1003 (10th Cir. 1993). A declaratory judgment also serves a useful purpose by clarifying the parties' obligations in this legal dispute. Thus, the first two factors weigh in favor of the plaintiffs.

Similarly, the third factor, whether the declaratory judgment is being used merely for the purpose of "procedural fencing" or to "provide an arena for a race to res judicata," also weighs in plaintiffs' favor. There is no evidence to suggest plaintiffs are seeking a declaratory judgment to gain a procedural advantage. Rather, it appears plaintiffs are seeking declaratory relief because that is the only appropriate relief at the moment. Defendant does suggest that plaintiffs removed their damages claim for purposes of class certification and will bring several damages claims at a later date. This allegation is unsubstantiated. Further, if defendant abides by the terms of the leases, as the court has defined them, plaintiffs will not need to bring a damages action against it.

The fourth factor also weighs in plaintiffs' favor because there are no state court proceedings in this case, thus, a declaratory judgment in this action would not increase friction between state and federal courts. *See Kunkle*, 866 F.2d at 1276 (stating, a district court "should not entertain a declaratory judgment action over which it has jurisdiction if the same fact-dependent issues are likely to be decided in another pending proceeding").

The final factor is whether there is an alternative remedy that is more effective than a declaratory judgment. As noted above, defendant has not ceased providing plaintiffs with free,

---

[10]Title 22 U.S.C. § 2202 provides, "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

useable gas. A damages action is not an effective or available alternative remedy despite defendant's protestations to the contrary.

Because the balance of the above factors weighs in plaintiffs' favor, the court dismisses defendant's argument that a declaratory judgment is not proper. Entering a declaratory judgment as to the parties' rights under the free gas clause is well within the court's discretion and appropriate in light of the foregoing factors. *See Wilton*, 515 U.S. at 282.

## V. Permanent Injunction

In addition to moving for summary judgment, plaintiffs also filed a Motion for Permanent Injunction (Dkt. No. 100). Plaintiffs seek to enjoin OXY from engaging in the following:

(a) acting or attempting to act in any way that interferes with or eliminates the ability of gas wells located on the premises to produce and provide adequate volume and useable quality natural gas for use in principal dwellings located on the premises for as long as OXY produces the well(s) on the lease;

(b) knowingly or intentionally reducing wellhead pressures in any manner that interferes with or eliminates the ability of such wells to produce adequate volume and useable quality natural gas for use in the principal dwellings located on such leases for as long as OXY produces the well(s) on the lease;

(c) directing or ordering its employees and field personnel to take no action to improve the house gas pressure even though such action has been taken in the past for as long as OXY produces the well(s) on the lease;

(d) disconnecting natural gas taps on lands in which members of the class own surface rights for as long as OXY produces the well(s) on the lease; and,

(e) failing to treat high H2S (at or above 10 ppm) wells before the gas is delivered to the house gas user for as long as OXY produces well(s) on the lease.

Dkt. No. 101, pg. 3.

*A. Legal Standard*

A permanent injunction is an extraordinary remedy, thus, the right to relief must be clear and unequivocal. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Plaintiffs must establish the following four elements to obtain relief:

> "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."

*Sw. Stainless, L.P. v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007)). "'The district court's discretion in this context is necessarily broad and a strong showing of abuse must be made to reverse it.'" *Id.* (quoting *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009)).

*B. Elements*

Here, this court has already found actual likelihood of success on the merits, as it has granted plaintiffs' Motion for Summary Judgment on this issue. *See Strouder v. M & A Tech., Inc.*, No. 09-4113, 2010 WL 2044666, at *10 (D. Kan. May 24, 2010). Therefore, plaintiffs must only prove the remaining three elements to obtain relief.

Irreparable harm may be shown when money damages are inadequate to compensate the wrong or when there are difficulties in the calculation of losses. *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp.2d 1253, 1259 (D. Kan. 2001). Purely speculative harm does not constitute irreparable harm. *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). The "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Id.*

(quotation omitted). "The concept of irreparable harm . . . does not readily lend itself to definition." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). And, it is not "an easy burden to fulfill." *Greater Yellowstone Coalition*, 321 F.3d at 1258.

First, on the irreparable harm issue, defendant has presented evidence that over 1,900 class members do not currently use house gas. Because these plaintiffs do not use house gas, they cannot show irreparable harm if defendant stopped providing them free house gas. Thus, plaintiffs have clearly failed to prove irreparable harm as to these class members. The remaining plaintiffs that currently use house gas have also failed to prove irreparable harm. Plaintiffs admit defendant has not presently terminated their use of free useable house gas but has only indicated it might to do so. Most importantly, plaintiffs have failed to show that money damages would not be sufficient to compensate any potential future injury. If defendant terminates plaintiffs' supply of free gas at a later date, they may bring a damages claim to recoup their loss of free gas.

Plaintiffs also claim irreparable harm in seven areas: (1) health hazards from high H2S gas; (2) the risk to safety from low pressure gas; (3) the home's uninhabitability for lack of gas; (4) the destruction of appliances that run on gas: (5) the health risks inherent in using dangerous gas; (6) the prohibitive cost of converting to an alternative fuel source; and (7) the inability of an individual surface owner to pursue a damage claim. Most of these alleged harms are nothing more than red herrings because OXY has not threatened to pump unsafe gas into plaintiffs' homes; it has only warned plaintiffs it may stop supplying them free useable gas. The dichotomy plaintiffs try to create is a false one. The potential consequences for plaintiffs are not free, useable gas on one hand and unsafe, high H2S gas on the other. Rather, plaintiffs are more accurately faced with a situation in which they will continue to receive free useable house gas or the free gas will be terminated. Thus,

plaintiffs' cited harms based on physical injury are simply inaccurate. The remaining harms plaintiffs cite, including their potential to lose free, useable house gas are not irreparable because money damages can adequately compensate them for this loss.

Plaintiffs' motion for permanent injunction also fails on the third element, whether the threatened injury outweighs the harm that the injunction may cause the opposing party. *See Sw. Stainless, L.P.*, 582 F.3d at 1191. As noted above, plaintiffs' threatened injury is the termination of free useable gas, rather than any harmful effects of using gas with high H2S. This harm is certainly not inconsequential or trivial, but it is compensable. Defendant, on the other hand, may be significantly harmed by the issuance of this injunction. First, defendant has presented testimony that it currently uses gathering line compressors and wellhead compressors to increase the pressure of the gas for production, which has necessarily lowered the delivery pressure of plaintiffs' house gas. Defendant has taken this action in order to maximize production, while still allowing enough pressure for free house gas. Plaintiffs' requested injunctive relief seeks to alter the status quo by prohibiting, or at least limiting, OXY's use of compression to increase the flow of gas for production. Granting such a request directly hinders OXY's ability to diligently produce and market gas. Additionally, plaintiffs' request that OXY be enjoined from failing to treat high H2S wells is unrelated to OXY's warning that it would terminate the plaintiffs' free gas. Plaintiffs have no evidence that OXY intends to provide plaintiffs with high H2S gas despite its proven risks. Further, to the extent plaintiffs' request can be construed as requiring OXY to treat high H2S gas at each plaintiffs' well, the permanent injunction would alter the status quo and place a significant financial burden on OXY.

Finally, the fourth element, whether the injunction will adversely affect the public interest,

28

is a neutral factor because the parties are both private parties and any effect on the public will be slight. Thus, this factor does not affect the analysis.

Ultimately, plaintiffs' requested injunctive relief fails to seek relief commensurate with the potential harm at issue. The court has granted plaintiffs' summary judgment motion and issued declaratory relief. Thereafter, plaintiffs can seek money damages in the event of a breach. Injunctive relief at this is premature given the practical difficulties of dealing with low pressure and high H2S gas coupled with OXY's obligation to market and produce the mineral estate diligently. Weighing the above factors, this court finds plaintiffs are not entitled to an injunction as they have shown neither irreparable harm or that the claimed threatened harm outweighs the harm to OXY. Therefore, plaintiffs' Motion for Permanent Injunction is denied.

IT IS ACCORDINGLY ORDERED this 29th day of September 2011, that plaintiffs' Motion for Summary Judgment (Dkt. No. 86) is granted and defendant's Cross-Motion for Summary Judgment (Dkt. No. 90) is denied.

IT IS FURTHER ORDERED that plaintiffs' Motion for Permanent Injunction (Dkt. No. 100) is denied.

s/ J. Thomas Marten_____
J. THOMAS MARTEN, JUDGE
